STEPHEN R. HARRIS, ESQ.
**Nevada Bar No. 001463**
CHRIS D. NICHOLS, ESQ.
**Nevada Bar No. 003123**
BELDING, HARRIS & PETRONI, LTD.
417 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 786-7600
Facsimile: (775) 786-7764

Attorneys for Debtor and
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * *

IN RE:

SKYE INTERNATIONAL, INC.
a Nevada corporation,

Debtor.
_____/

Case No. 09-54485
(Chapter 11)

**APPLICATION FOR ORDER AUTHORIZING DEBTOR TO EMPLOY ACCOUNTANT FOR SPECIAL PURPOSE (11 U.S.C. §327(b)) [MANTYLA MCREYNOLDS, LLC]**

Hrg. DATE:    12-21-09
Hrg. TIME:    11:00 a.m.
Est Time:     10 mins
Set by:       Pursuant to Ex Parte Motion for Order to Hear First Day Motions on Shortened Time

*TO: The Honorable Gregg W. Zive, United States Bankruptcy Judge*

COMES NOW SKYE INTERNATIONAL, INC., a Nevada corporation, Debtor and Debtor-In-Possession herein "Debtor"), by and through its attorney of record, STEPHEN R. HARRIS, ESQ., and CHRIS D. NICHOLS, ESQ., of BELDING, HARRIS & PETRONI, LTD. and file its APPLICATION FOR ORDER AUTHORIZING DEBTOR TO EMPLOY ACCOUNTANT FOR SPECIAL PURPOSE (11 U.S.C. §327(b)) [MANTYLA MCREYNOLDS LLC], and alleges as follows:

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

1

1.  A Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code was filed by the Debtor on December 16, 2009. The Debtor is a designer and manufacturer of electric tankless water heaters which provided significant energy efficiency, cost-savings and water-savings to millions of customers in this country. Debtor distributes its products widely throughout the United States primarily through the wholesale distribution channel. Recent distribution channels currently being tested include door-to-door direct, as well as sales to plumbers and consumers directly through the internet

2.  STEPHEN R. HARRIS, ESQ., and CHRIS D. NICHOLS, ESQ., of BELDING, HARRIS & PETRONI, LTD., were appointed pending the general bankruptcy counsel for the Debtor.

3.  Debtor continues to conduct its business in a Debtor-In-Possession status.

4.  Debtor is a publicly traded entity traded over the counter with a stock trading symbol of SKYI. The Debtor requires the continued appointment of its independent auditors in connection with matters arising under state and federal securities laws and other related matters as may be required from time to time.

5.  Pursuant to the provisions contained in 11 U.S.C. Sections 327(b) and 1107(b), the Debtor hereby applies to the Court to appoint Matt McReynolds and his accounting firm MANTYLA MCREYNOLDS, to act as independent auditors to represent the Debtor's interests, as more specifically set forth in Paragraph 4 above. The appointment of MATT MCREYNOLDS, and his accounting firm MANTYLA MCREYNOLDS, to represent the Debtor in this case is in Debtor's best interests and would be the most efficient manner of proceeding for the bankrupt estate.

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

6. The consideration agreed to be paid to MATT MCREYNOLDS., and the members of his law firm MANTYLA MCREYNOLDS, subject to the approval of the United States Bankruptcy Court, is to employ the accountants under a general retainer based on time and standard billable charges in effect on the date services are provided. The accounting firm shall be paid for its normal actual time charges and disbursements. The Debtor has agreed that MATT MCREYNOLDS, and all members of his accounting firm who subsequently are approved to provide services in this case, shall be compensated for services at their current standard hourly rates. The professional time of accountants, auditors and accounting assistants will be taken into account at fixed item rates based on the nature of the matter. The present item rate for re-audit services is $7,500, Integrated Audit Services is $15,000 and Quarterly Review Services is $3,500. MANTYLA MCREYNOLDS engagement letter is attached hereto as **Exhibit "A"** and incorporated herein by reference. The fees also include charges for reasonable and necessary third-party and staff services employed in the course of the representation, such as long distance telephone calls, postage, messenger service, photocopying, filing fees, travel, and computerized legal research. These are separately itemized on the firm's statements based on the services involved and out-of-pocket disbursements incurred. These are the customary rates charged by said firm. Finally, this basis of compensation is authorized pursuant to Sections 328(a) and 331 of the Bankruptcy Code.

7. MATT MCREYNOLDS has indicated his willingness to act on behalf of the Debtor, and to be compensated in accordance with the terms and conditions set forth in Paragraphs 5 and 6 herein. To the best of Debtor's knowledge, MATT MCREYNOLDS, and his accounting firm MANTYLA MCREYNOLDS, do not have any

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

connection with the Debtor's other attorneys or accountants, which would or could affect the scope of retention agreed upon hereon, and no connection to any person in the office of the United States Trustee, and represent no interest adverse to the estate in matters upon which he is to be retained. MATT MCREYNOLDS., and his accounting firm MANTYLA MCREYNOLDS, have represented the Debtor as to independent audit and accounting matters since September 11, 2009, and there is an outstanding pre-petition balance of $11,000.00. Based on the education and prior accounting experience of MATT MCREYNOLDS, and members of his accounting firm MANTYLA MCREYNOLDS, the Debtor believes his employment is in the best interests of the estate and that his education and experience will save the estate considerable expense.

**WHEREFORE,** the Debtor requests the entry of an order: 1) authorizing it to employ and retain MATT MCREYNOLDS and his accounting firm MANTYLA MCREYNOLDS, pursuant to the terms and conditions recited above, to perform accounting and audit functions during the pendency of this case; 2) authorizing it to pay the accounting firm of MANTYLA MCREYNOLDS on a monthly basis according to the terms and conditions set forth hereinabove; and 3) for such other and further relief as the Court deems just under the circumstances.

DATED this 16th day of December, 2009.

STEPHEN R. HARRIS, ESQ.
CHRIS D. NICHOLS, ESQ.
BELDING, HARRIS & PETRONI, LTD.
417 W. Plumb Lane
Reno, NV 89509

_____
ATTORNEY FOR DEBTOR

## VERIFICATION

I, GREGG C. JOHNSON, Executive Vice-President of the Debtor SKYE INTERNATIONAL, INC., a Nevada corporation, declare under penalty of perjury that I have read the foregoing APPLICATION FOR ORDER AUTHORIZING DEBTOR TO EMPLOY ACCOUNTANTS (11 U.S.C. '327(b)) [MANTYLA MCREYNOLDS], and that the contents contained therein are true and correct to the best of my knowledge, information and belief.

DATED this 15th day of December, 2009.

_____
GREGG JOHNSON, Executive Vice-President
SKYE INTERNATIONAL, INC

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

# EXHIBIT "A"

# EXHIBIT "A"





September 11, 2009

Skye International, Inc.
7701 E. Gray Rd., Suite 104
Scottsdale, Arizona

Members of Skye International, Inc. Board of Directors and Management:

We are pleased to confirm our understanding of the services we are to provide for Skye International, Inc. ("the Company") for the year ended December 31, 2009 and the December 31, 2008 re-audit period.

We will audit the balance sheets of the Company as of December 31, 2009 and the re-audit period as of December 31, 2008, and the related statements of operations, stockholders' equity and comprehensive income, and cash flows for the years then ended. The objective of an audit of the financial statements is to express an opinion on the financial statements in accordance with accounting principles generally accepted in the United States (GAAP). As part of our engagement, we will also audit the Company's internal control over financial reporting as of December 31, 2009. The objective of our audit of internal control over financial reporting is to express an opinion as to whether the Company maintained effective internal control over financial reporting as of December 31, 2009 based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Our audit of the financial statements and internal control will be conducted in accordance with the standards established by the Public Company Accounting Oversight Board (PCAOB) and will include tests of the Company's accounting records and other procedures we consider necessary to enable us to express our opinions. If our opinions are other than unqualified, we will discuss the reasons with Company management in advance. If, for any reason, we are unable to complete our audits or are unable to form or have not formed our opinions, we may decline to issue a report as a result of this engagement.

We will plan and perform the audit of the financial statements to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, tests of physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, and financial institutions. In connection with our audit of the financial statements, we will obtain an understanding of internal control sufficient to plan the audit and to determine the nature, timing and extent of audit procedures to be performed. At the conclusion of our audit, you agree to provide certain representations from management about the Company's financial statements and related matters.

We will plan and perform the audit of internal control over financial reporting to obtain reasonable assurance about the effectiveness of internal control over financial reporting. The audit will include procedures to obtain an understanding of internal control over financial reporting, assess the risk that a material weakness exists, test and evaluate the design and operating effectiveness of internal control based on the assessed risk, and perform other procedures we consider necessary to obtain such assurance. At the conclusion of the audit, you agree to provide certain representations from management about the Company's internal control over financial reporting and related matters.

Because our audits are designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements or material weaknesses in internal control over financial reporting may exist and not be detected by us. In addition, our financial statement audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. We will, however, communicate to the board of directors and management of the Company, as appropriate, any errors, fraud, or other illegal acts that come to our attention during our audit, unless clearly inconsequential. Further, our internal control audit is not designed to disclose deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness. Projections of any evaluation of the effectiveness of internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We will communicate in writing to the Board of Directors and management any significant deficiencies and material weaknesses relating to internal control over financial reporting identified while performing our audit. We will also communicate in writing to management all deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies. If we conclude that the Board of Director's oversight of the Company's external financial reporting and internal control over financial reporting is ineffective, we will communicate that conclusion in writing to management and the Board of Director's.

We are also responsible for communicating with the board of directors about certain other matters related to our audit, including (1) our audit responsibility under PCAOB standards; (2) information relating to our independence with respect to the Company; (3) the Company's critical accounting policies; (4) the quality of the Company's accounting principles; (5) management's judgments and sensitive accounting estimates; (6) significant audit adjustments; (7) any disagreements with management about matters that could be significant to the Company's financial statements or our report; (8) any consultations management made with other accountants; (9) any issues discussed with management prior to retention; (10) any significant difficulties encountered in performing the audit; (11) other information in documents containing audited financial statements, such as the Company's annual report; and (12) other matters as considered necessary. Further, we are responsible for ensuring that the board of directors receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control, or other matters.

Management is responsible for the financial statements, for making all financial records and related information available to us on a timely basis, and for the accuracy and completeness of that information. Management is also responsible for the establishment and maintenance of internal controls, including monitoring activities; the establishment and maintenance of adequate records; the selection and application of accounting principles; the safeguarding of assets; adjusting the financial statements to correct material misstatements; and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. In addition, management is responsible for identifying and ensuring that the Company complies with applicable laws and regulations.

Management is also responsible for establishing and maintaining effective internal control over financial reporting; evaluating the effectiveness of the Company's internal control; providing a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the year; notifying us of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's evaluation, including separate disclosure of significant deficiencies and material weaknesses; describing to us any fraud resulting in a material misstatement of the financial statements and any other fraud involving senior management or employees who have a significant role in the Company's internal control; notifying us about whether control deficiencies identified and communicated by prior auditors to the Board of Directors during previous engagements have been resolved; and indicating to us whether there were any changes in internal control over financial reporting subsequent to the report date or other factors that might significantly affect internal control over financial reporting. If management does not fulfill these responsibilities, we will

communicate in writing to the Board of Directors and management that we are unable to satisfactorily complete our audit of internal control and must disclaim an opinion.

With regard to the electronic dissemination of audited financial statements, including financial statements published electronically on the Company's website, we are not required to read the information contained in those sites or to consider the consistency of other information in the electronic site with the original document.

We are required to read any document, including the annual report to shareholders and filings with the SEC, that contains or incorporates by reference our audit or interim review reports, or contains any reference to us. We will read the annual report for the purpose of determining whether other information in the annual report (including the manner of its presentation) is materially inconsistent with information in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

Regarding electronic filings such as the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, management agrees that, before filing any document in electronic format with the SEC with which we are associated, we will be advised of the proposed filing on a timely basis. We will provide the Company a signed copy of our report and consent. These manually signed documents will serve to authorize the use of our name prior to the Company's electronic transmission. Management will provide us with a complete copy of the document accepted by EDGAR.

Our fee for the audit services will be fixed based on the amounts identified in the attached Appendix, not including any unforeseen obstacles which would require substantial additional time to resolve. We will use our best efforts to communicate such instances prior to incurring additional time. Our invoices for these fees will be rendered each month as work progresses and are payable on presentation. In addition, our fee for resolving any problems as heretofore described or consultation subsequent to the issuance of the financial statements will be at our normal per diem rates. We anticipate collecting a retainer of $5,000 prior to commencement of significant field work. The retainer will be applied to the engagement final invoice. In accordance with our firm policies, work may be suspended if the Company's account becomes 60 days or more overdue and will not be resumed until the account is paid in full. If we elect to terminate our services for nonpayment, our engagement will be deemed to have been completed even if we have not issued our report. We accrue finance charges of 18% on amounts outstanding greater than 30 days. We will require full payment for our services prior to the issuance of our audit report.

The Company may wish to include or incorporate by reference our audit report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. If so, you agree not to include our audit report or make reference to our Firm without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Any additional services that may be requested and we agree to provide, will be the subject of separate arrangements.

The audit documentation for this engagement is the property of our firm and constitutes confidential information. However, we may be requested to make certain audit documentation available to the PCAOB, SEC, or other regulators pursuant to the authority given to them by law or regulation. If requested, access to such audit documentation will be provided under the supervision of firm personnel. Further, upon request, we may provide copies of selected audit documentation to the regulator. The regulator may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies.

In conjunction with the annual audit, we will also perform reviews of the Company's unaudited quarterly financial information for the remaining quarters in 2009 and each of the four quarters in the year ending December 31, 2010. For the first three quarters, we will perform reviews of that information before the Form 10-Q is filed. The objective of a review is to provide a basis for communicating whether there are any material modifications that should be made to the interim financial information for it to conform with GAAP, or any

modifications that should be made to the disclosures about changes in internal control for management's quarterly certifications on internal control over financial reporting to be accurate and to comply with SEC requirements. Our fee for these services will be at our standard rates plus any out-of-pocket costs as identified with the Appendix, not including any unforeseen obstacles which would require substantial additional time to resolve. We will discuss the potential effects of the services on the independence of the firm with the Board of Directors.

These reviews will be conducted in accordance with the standards of the PCAOB. A review of interim financial information consists principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters. It includes obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information to identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and to select the inquiries and analytical procedures that will provide a basis for communicating whether there are material modifications that should be made to the interim financial information for it to conform with GAAP. A review of interim financial information also includes evaluating management's quarterly certifications about internal control over financial reporting by making inquiries of management; evaluating the implications of how misstatements identified by us during the review relate to effective internal control; and determining through observation and inquiry whether any change in internal control has materially affected, or is reasonably likely to affect, the Company's internal control over financial reporting. A review is substantially less in scope than an audit conducted in accordance PCAOB standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we will not express opinions on the interim financial information or the quarterly certifications about internal control over financial reporting.

Management is responsible for the Company's interim financial information and for establishing and maintaining effective internal control over financial reporting. It is also responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities; making all financial records and related information available to us; adjusting the interim financial information to correct material misstatements; affirming that the effects of any uncorrected misstatements pertaining to the periods under review are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole; and making certain quarterly certifications with respect to the Company's internal control over financial reporting.

We will communicate to the Board of Directors and management any matters that come to our attention as a result of the reviews that we believe may require material modifications to the quarterly financial information to make it conform with GAAP. We will also communicate any modifications that we believe may be required for the disclosures about changes in internal control for management's quarterly certifications on internal control over financial reporting to be accurate and to comply with SEC requirements. Further, we will communicate any significant deficiencies or material weaknesses that come to our attention. If, for any reason, we are unable to complete our reviews or are unable to form or have not formed our opinions, we will notify the Board of Directors and management. At the conclusion of our reviews, you agree to provide require certain representations from management about the financial statements, the Company's internal control over financial reporting, and related matters.

All services provided pursuant to this agreement will be performed solely and exclusively by Mantyla McReynolds LLC, an independent member of the BDO Seidman Alliance. Therefore, neither BDO Seidman, LLP or any member of the BDO Seidman Alliance, other than Mantyla McReynolds LLC, shall be deemed to have any responsibility whatsoever for the performance or non-performance of the services provided pursuant to this agreement.

We appreciate the opportunity to be of service and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,
MANTYLA McREYNOLDS, LLC

*[signature]*

Jon E. Lelegren, CPA

cc: Chief Financial Officer and Chief Executive Officer

RESPONSE:
This letter correctly sets forth the understanding of Skye International, Inc.

*[signature]*
~~Board of Directors Chair~~  President, CEO + Director

_____September 14, 2009_____
Date

Appendix

**Fees for Services**

Our fees for audit services we will perform are estimated as follows:

|  | Fixed Fee |
|---|---|
| **Re-Audit:** |  |
| Audit of the balance sheet of Skye International, Inc. as of December 31, 2008, and the related statements of operations, shareholders' equity and cash flows for the year ended December 31, 2008 | $ 7,500 |
| Total Re-Audit | $ 7,500 |
| **Integrated Audit 2009:** |  |
| Integrated audit of the balance sheet of Skye International, Inc. as of December 31, 2009, and the related statements of operations, shareholders' equity and cash flows for the year ended December 31, 2009 | $ 15,000 |
| Audit of internal controls over financial reporting as of December 31, 2009 | $ 7,500 |
| Total Integrated Audit | $ 22,500 |

The proposed re-audit fee assumes a discounted fee based on efficiencies that should exist from a re-auditing standpoint. If the prior year work papers are not sufficient, we will reevaluate this discount. The proposed fee for these periods will be reevaluated if significant changes occur within your Company, and any fee changes will be authorized by management and the Board of Directors prior to the performance of services. In addition, our fee for project consultations subsequent to the issuance of the financial statements will be at our normal per diem rates. Progress billings will be due upon presentation and all billed amounts must be paid prior to the release of our reports. Our proposed fees for each interim review will be $3,500.

The fee quote above assumes the following:

- Management will prepare necessary supporting schedules and analyses, and continue to maintain and implement an effective system of internal controls over financial reporting.
- Audit adjustments will be few and insignificant in nature, with no material weaknesses in controls related to financial reporting.
- Our agreed-on scope of audit services will not be significantly modified, and are based upon the Company being a development stage entity. Services for various registration statements pertaining to potential secondary equity offerings, debt offerings, and other regulatory filings not pertaining to the audit will require management and Board of Director authorization.
- Reasonable out-of-pocket costs will be billed in addition to the fee quote. These costs are expected to be inconsequential in comparison to the overall fee structure, primarily due to the local proximity of our firm and engagement team to the Company.
- Inventory documentation for the re-audit period will be adequate for our re-testing procedures.

- No significant findings (i.e. material misstatements, disclosure deficiencies) will be identified during the re-audit.

Our fee and expenses will be billed as charges are incurred. The ethics of our profession prohibit the rendering of professional services where the fee for such services is contingent, or has the appearance of being contingent, upon the results of such services. Accordingly, in order to avoid the possible implication that our fee is contingent upon the success of the contemplated offering, it is important that our bills be paid promptly when rendered. If a situation arises in which it may appear that our independence would be questioned because of significant unpaid bills, we may be prohibited from signing our audit reports and consent.